JACOBSON LAW FIRM
570 N. COLUMBUS BLVD., SUITE B
TUCSON, AZ 85711
TELEPHONE (520) 834-8034
FACSIMILE (520) 844-1011
jeff@jacobsonlawfirm.net
Jeffrey H. Jacobson, SB No. 019502
Alexis B. Sharpe, SB No. 034177
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Conference of Police and Sheriffs, Inc., an Arizona non-profit corporation; Dawn Barkman; and Joseph Murphy on their own behalf and on behalf of all others similarly situated<br>Plaintiffs,<br>v.<br>Pima County,<br>Defendant. | Case No.:<br><br>**COMPLAINT** |

## NATURE OF THE ACTION

1. Reducing the risk of COVID-19 infections, and measures which protect the health and wellness of both the general community and Pima County employees are laudable, important goals. Those measures, however, must be taken in accordance with well-established law. This case is not about the constitutionality or efficacy of vaccine mandates promulgated by government entities. Instead, this action seeks to overturn Pima County's illegal, coercive vaccine surcharge of $45.51 per pay period on health insurance premiums for unvaccinated employees.

## PARTIES

2. The Arizona Conference of Police and Sheriffs (AZCOPS) is a nonpartisan, nonprofit membership organization composed of law enforcement officers employed in the State of Arizona. The general objectives of AZCOPS consist of promoting labor,

benevolent, educational, charitable, civic, patriotic, and fraternal activities among the members.

3. AZCOPS specific objectives include, but are not limited to, preserving and strengthening comradeship among its members; improving the wages, and working and living conditions of its members and their families (including hours of work and job security); promoting the health, security, economic, cultural, legislative, educational, social, political, and recreational interests of its members and their families and others; defending and extending democratic institutions and procedures and civil rights and liberties of its members and their families and all others; and maintaining true allegiance and faith in the laws of the State of Arizona and the United States Constitution.

4. AZCOPS, with over 2,900 dues-paying members, is incorporated in Arizona. AZCOPS is headquartered in Pima County, Arizona.

5. Plaintiff Dawn Barkman is a Sergeant with the Pima County Sheriff's Department. She is a resident of Pima County, Arizona, and is a member of AZCOPS.

6. Plaintiff Joseph Murphy is a Sergeant with the Pima County Sheriff's Department. He is a resident of Pima County, Arizona, and is a member of AZCOPS.

7. All events alleged occurred in Pima County, Arizona.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3).

9. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events complained of in this case occurred in this judicial district.

11. AZCOPS, on behalf of its aggrieved members, and Plaintiffs Barkman and Murphy, bring this action against the County for declaratory judgment and permanent injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq.

(2012), the Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 18001, and the Health Insurance Portability and Accountability Act (HIPAA) of 1996, 42 U.S.C. § 1320d.

**FACTUAL ALLEGATIONS**

**I.    Statutory and Regulatory Background**

**A.    Pima County's Board of Supervisors authority and governance over the Pima County employee health insurance plan**

12.    Defendant Pima County's (County) health insurance plan (Plan) is self-insured.

13.    The County contracts with Aetna to administer the County's Plan.

14.    With self-insured (also known as self-funded) health plans, the financial risk associated with medical claims is held by the organization sponsoring the health coverage.

15.    One of the key aspects of a self-insured health plan is that it gives the organization providing the insurance greater control over benefit design.

16.    In the County's Plan, premiums are shared between the enrolled employee and the County.[1]

17.    The County also has a Wellness Program through which employees can receive a discount off of their premiums of up to $35 per pay period when they do not use tobacco and engage in certain Healthy Lifestyle Activities.

18.    The County's Administrator (County Administrator), Chuck Huckleberry, is employed by and reports to the Pima County Board of Supervisors (Board).[2]

19.    Under the Board's direction, the County Administrator is "responsible for the general direction, supervision, administration, and coordination of all affairs of the county (including county administrator's office), except those duties exercised by the other

---

[1] Coverage, eligibility, and enrollment date information can be found at *Pima County Personnel Policy 8-122 – Group Insurance* (effective Oct. 6, 2020), https://webcms.pima.gov/UserFiles/Servers/Server_6/File/Government/Human%20Resources/MSRPP/8-122%2010062020.pdf

[2] Chief Deputy County Administrator Jan Lesher is the Acting County Administrator while Mr. Huckleberry recovers from injuries he sustained on October 23, 2021.

elected officials of the county." Pima County, Ariz., General Ordinance tit. 2, ch. 12, § 070 (2021).

20. The County Administrator has the duty to act as a liaison between County department heads and the Board, coordinate the affairs of County departments as they relate to "budget, finance and personnel policies of the county," and recommend to the Board necessary or expedient measures and ordinances concerning the operations and administration of the County. *Id.* § 070(D), (F).

21. The "administrator shall have such other duties and responsibilities as are reasonably necessary for the efficient administration of the county and as may be authorized by the board." *Id.* § 070(P).

22. The Board is the governing body of the County, and though it can delegate administrative and executive powers to others (such as the County Administrator), it has ultimate responsibility for the affairs of the County. PIMA COUNTY, ARIZ., GENERAL ORDINANCE tit. 2, ch. 04, § 010 (2021).

23. Arizona state law establishes that the Board may "[a]dopt provisions necessary to preserve the health of the County, and provide for the expenses thereof" and "[p]rovide for fringe benefits for county employees, including sick leave, personal leave, vacation and holiday pay and jury duty pay." A.R.S. §§ 11-251(17), (51).

24. The Board is also explicitly permitted to procure health insurance for County employees and determine what portion of the premiums should be paid by the employee. A.R.S. § 11-263(A).

25. The Board may deduct the cost of an employee's premium from his or her compensation and apply it towards that employee's premiums if the employee has agreed in writing to participate in the program. A.R.S. § 11-263(A).

26. Plaintiffs Barkman and Murphy are beneficiaries and participants of the Plan.

**B. HIPAA's rules regarding penalties and incentives in employee wellness programs, and the ACA's effects on those rules**

27. HIPAA addresses penalties and incentives in employee wellness programs.

4

28. Congress enacted HIPAA to "reduce . . . barriers to obtaining health coverage by making it easier for people who change jobs or lose their jobs to maintain adequate coverage, and by providing increased purchasing power to small businesses and individuals." S. Rep. No. 104-156, at 1 (1995).

29. The ACA was adopted by Congress and signed into law in 2010.

30. Among other effects, the ACA amended HIPAA.

31. Wellness programs are regulated in part by HIPAA, as amended by the ACA, as well as by HIPAA's implementing regulations.

32. The ACA also codified prior agency guidance on wellness programs and expanded the scope of permissible incentives under such programs.[3]

33. Federal law generally prohibits group health plans from charging similarly situated individuals different premiums or contributions or imposing different deductibles, copayment or other cost sharing requirements based on a "health status-related factor."

34. However, federal law allows covered entities to offer "premium discounts or rebates" on a plan participant's copayments or deductibles in return for that individual's compliance with a wellness program. *See* 29 U.S.C. § 1182(b)(2)(B); 26 U.S.C. § 9802(b); 42 U.S.C. § 300gg-4(b).

35. Specifically, the relevant statute reads as follows:

> A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

29 U.S.C. § 1182(b)(1); *see also* 26 U.S.C. § 9802(b)(1); 42 U.S.C. § 300gg–4(b)(1).[4]

---

[3] Prior to the ACA, regulations under HIPAA limited the value of wellness incentives to 20% of the overall cost of health insurance coverage. Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. 33,158, 33,191 (June 3, 2013).

[4] The Departments of Treasury, Labor, and Health and Human Services instituted substantively identical regulations outlining the requirements for wellness programs. *See*

5

36. According to 29 U.S.C. § 1182(a)(1), a "health status-related factor," also referred to as a health factor (Health Factor), is defined as:

    A.    Health Status
    B.    Medical condition (including both physical and mental illnesses).
    C.    Claims experience.
    D.    Receipt of health care.
    E.    Medical history.
    F.    Genetic information.
    G.    Evidence of insurability (including conditions arising out of acts of domestic violence).
    H.    Disability

37. Vaccinations are a Health Factor because the individual being vaccinated receives health care (the vaccine) which inherently and irrevocably results in a health-related standard (being vaccinated.)

38. 29 U.S.C. § 1182 also does not operate to prevent an employer offering a group health plan, and a health insurance issuer offering group health insurance coverage from

> ….establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention. 29 U.S.C. § 1182(b)(2)(B); *see also* 26 U.S.C. § 9802(b)(2)(B); 42 U.S.C. § 300gg–4(b)(2)(B).

39. A "reward" or incentive may include a discount on insurance costs or a penalty that increases the plan participant's costs because of non-participation in the wellness program. See 26 C.F.R. § 54.9802-1(f)(1)(i).[1]

---

[1] 26 C.F.R. § 54.9802-1(f) (2014), 29 C.F.R. § 2590.702(f) (2014), 45 C.F.R. § 146.121(f) (2014). Citations which follow will be to the Department of Labor (DOL) regulations only. The cited DOL subsections can be applied to the Treasury and HHS regulations to find identical language. For example, the language in 29 CFR § 2590.702(f)(3) will be the same in 26 CFR § 54.9802-1(f)(3) and 45 CFR § 146.121(f)(3).

40. Further, according to the Equal Employment Opportunity Commission (EEOC), employers are permitted to offer incentives to employees for voluntarily receiving a vaccination administered by the employer or its agent.[5]

41. As defined by the EEOC, an incentive includes both rewards and penalties. Importantly, however, the incentive cannot be "so substantial as to be coercive."

42. Wellness programs are either "health-contingent" or "participatory." 29 C.F.R. § 2590.702(f).

43. Group health plans and insurers are authorized to offer incentives of up to 30% of the cost of coverage in exchange for an employee's participation in a health-contingent wellness program.

44. A health-contingent wellness program is a kind of wellness program in which the reward is based on an insured individual's satisfaction of a particular health-related factor.

45. If none of the conditions for obtaining a reward under a wellness program is based on a person satisfying a health-related standard (or if a wellness program does not provide a reward), the program is considered "participatory." 29 C.F.R. § 2590.702(f)(1)(ii). For example, diagnostic testing programs that provide rewards for engaging in tests, regardless of the outcome of the test, are participatory programs. *Id.* Other examples of participatory programs include rewards for maintaining a health club membership, attending health education seminars, and participating in tobacco use cessation programs (even if you do not stop using tobacco). *Id.*

46. A wellness program that requires individuals "to satisfy a standard related to a health factor to obtain a reward (or… undertake more than a similarly situated individual based on a health factor in order to obtain the same reward)" is a "health-contingent" program. 29 C.F.R. § 2590.702(f)(1)(iii).

---

[5] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K.15

7

47. All health-contingent programs have five requirements. *Id* at § 2590.702(f)(3)–(4):

   a) The employee must be given the opportunity to qualify for the reward at least once per year. *Id*. at §§ 2590.702(f)(3)(i), (4)(i);

   b) The 'reward' cannot generally exceed 30% of the cost of the employee coverage under the plan. *Id*. at §§ 2590.702(f)(3)(ii), (4)(ii), (5);

   c) The program must be reasonably designed to promote health or prevent disease. *Id*. at §§ 2590.702(f)(3)(iii), (4)(iii);

   d) The reward must be available to all similarly situated individuals, which means employers must provide a reasonable alternative standard or waive the standard upon an employee's request. *Id*. at §§ 2590.702(f)(3)(iv), (4)(iv); and

   e) The employer must disclose the availability of the possibility of the reasonable alternative standard or waiver in all materials describing the terms of the wellness program. *Id*. at §§ 2590.702(f)(3)(v), (4)(v).

48. Health-contingent programs can be either activity-only or outcome-based. 29 C.F.R. § 2590.702(f)(1)(iii).

49. Activity-only programs simply require that individuals engage in a health-related activity, such as an exercise program. 29 C.F.R. § 2590.702(f)(1)(iv)–(v).

50. For activity-only wellness programs, the reasonable alternative standard must be available to individuals who have a medical condition that makes it unreasonably difficult to satisfy the applicable standard. *Id* at § 54.9802-1(f)(3)(iv).

51. An activity-only wellness program requires an individual to perform or complete an activity related to a health factor in order to obtain a reward but does not require the individual to attain or maintain a specific health outcome. 29 C.F.R. § 2590.702(f)(1)(iv).

52. The regulation also specifically identifies activity-only examples as exercising and going to a doctor because those do not require a person to attain a certain result.

53. Outcome-based programs require that individuals maintain a certain health standard, such as receiving certain test results or being tobacco free. 29 C.F.R. § 2590.702(f)(1)(iv)–(v).

54. For outcome-based wellness programs, the reasonable alternative standard must be available to any individual who does not meet the initial standard based on the measurement, test, or screening. *Id* § 54.9802-1(f)(4)(iv).

55. Federal regulations include many examples of programs that are - and are not - valid. *Id*. at § 2590.702(f)(3)(vi), (4)(vi).

56. In one example, an employer used an outcome-based wellness program where the health standard was not using tobacco, and individuals that did use tobacco (and therefore failed to meet the original health standard) had to be given the opportunity to meet a reasonable alternative standard - such as participating in a tobacco cessation program - before surcharges were imposed. *Id*. at § 2590.702(f)(4)(vi).

57. The County's wellness program is health-contingent because it requires employees to satisfy a standard related to a health factor to obtain a reward. In contrast, participatory wellness programs are generally available without regard to an individual's health status. In a participatory wellness program, either no reward is offered, or none of the conditions for obtaining a reward are based on an individual satisfying a standard related to a health factor.

**C.    The County debates and implements a coercive surcharge penalty**

58. To address the COVID-19 public health crisis, County administration has debated and imposed various mandatory measures on County employees.

59. A July 29, 2021, Memorandum from Chief Deputy County Administrator Jan Lesher (Lesher Memo) to the County Administrator entitled "Response to Mandatory COVID-19 Vaccination for Employees with Medical and Religious Exemptions Memorandum Dated July 22, 2021," referring to a possible County vaccine mandate, outlines "additional information to consider when making this critical decision."

60. On August 10, 2021, in a Board Memorandum, the County Administrator indicated that "<u>I would ask the Board to require COVID-19 vaccinations for our employees as a condition to continued employment with Pima County</u>." (Emphasis in original).

61. The same August 10 Board Memorandum suggested that employees be required to have at least their first immunization no later than October 1, 2021.

62. On August 16, 2021, the County Administrator issued a memorandum to the Board entitled "COVID-19 Vaccination Incentives and Disincentives." (August 16 Memo) Exhibit A.

63. The August 16 Memo listed, as one of three disincentives:

> Developing a separate health insurance medical premium for unvaccinated employees due to medical expense risk related to contracting COVID-19. An additional $25.51 remaining surcharge can be applied to all tier levels (employee only, employee plus spouse, employee plus children, and employee plus family) or $663.26 annually.

64. The August 16 Memo also acknowledged that items two and three:

> are regulated by the . . . ACA which permits employers to offer up to 30 percent of the cost of health plan coverage as an incentive to participate in a wellness program (or surcharge.) An employer may offer up to 30 percent of the total cost of self-only health plan coverage to an employee as an incentive (surcharge) to participate in a wellness program. If the employer offers more than one plan, the 30 percent applies to the lowest cost plan. Here, the total amount that can be applied to a surcharge for any employee is $60.51 per pay period ($35.00 + $25.51) or $1,573.26 annually.

65. Finally, the August 16 Memo recommended the Board "adopt incentives for vaccinated employees and disincentives for unvaccinated employees" to consist of:

> a) a one-time $300 COVID-19 Health Incentive for all employees fully vaccinated by October 1, 2021; and

> b) A financial disincentive for unvaccinated employees effective October 1, 2021 that eliminates all health insurance premium discounts ($35 per pay period) and add a 30 percent base plan surcharge of $25.51 per pay period for a total disincentive amount of $60.51 per pay period or $1,573.26 per year. Unvaccinated employees with a valid medical or religious exemption would not be subject to the surcharge.

66. At the August 16, 2021, Board meeting, County Supervisors extensively discussed their concerns over employee vaccination and infection rates within the County and its departments.

67. At the same Board meeting, referencing his memorandum, the County Administrator raised the issue of "various incentives and disincentives that could be adopted to encourage employees to become vaccinated."

68. On August 16, 2021, in a 3-2 vote, the Board adopted a $300 incentive payment to any vaccinated employee and three days of leave for any vaccinated employee eligible to receive County leave who gets vaccinated. The Board also deferred the discussion on the vaccine disincentives (as outlined in the August 16 Memo) to a future Board meeting.

69. On August 31, 2021, the County Administrator mandated that all offers of County employment (including promotions) on or after August 30, 2021, were contingent upon the selected individual either being or becoming vaccinated against COVID-19 within their first 30 days of employment with the County.

70. At its meeting on September 7, 2021, the Board continued its discussion of the "vaccine disincentives" agenda item.

71. According to the Board's approved meeting minutes, during debate on the vaccine disincentives agenda item, Supervisor Adelita Grijalva asked whether there were results from the incentives the County previously implemented. The County Administrator reported that before adopting the incentives, 43% of the workforce had been vaccinated. Since then, the percentage rose to 66%. Exhibit B.

72. Also during debate on the same agenda item, "Supervisor [Steve] Christy reiterated his concern regarding liability issues that could arise from imposing disincentives on employees. He stated that the County and the County Administration were instituting a hostile work environment by financially penalizing unvaccinated employees. He added that lawsuits could be more-costly than the alleged increases to the health care program."

11

73. On September 7, 2021, by a 4-1 vote, the Board approved the vaccine disincentives presented in the County Administrator's August 12, 2021, Memorandum.[6]

74. On September 20, 2021, the County Administrator issued a memorandum "Amending the Proposed Vaccine Disincentive in Order to Preserve the Health Insurance Premium Discount (Wellness) Program." (September 20 Memo). Exhibit C.

75. The first paragraph of the September 20 Memo indicates, in part:

> After additional consideration, I am recommending that we maintain the health insurance premium discounts for unvaccinated employees. These discounts were earned by the employee in recognition of the employee's adherence to several key elements of a healthy lifestyle. If, for example, an employee is and remains tobacco free he or she earns $20 per pay period. While we must encourage employees to become vaccinated, to penalize a nonsmoker for not being vaccinated could inadvertently negate the importance of not smoking. The same principle is true for the variety of health lifestyle incentives.

76. The September 20 Memo omits the fact that the same employee will earn that $20/pay period wellness program incentive even if the employee does not remain tobacco-free, but still attends a tobacco cessation program *as an alternative*.

77. The September 20 Memo continues:

> I am recommending . . . that we amend the disincentives to include only a separate health insurance medical premium for unvaccinated employees due to the increased medical expense risk related to contracting COVID-19. As a result, the full amount of the financial disincentive previously approved of $60.51 per pay period or $1,573.26 per year cannot be assessed if we are to remain compliant with the [ACA] as defined by the [EEOC].

78. To accomplish the goal of creating a coercive surcharge, and remain a HIPAA/ACA-compliant health-contingent, outcome-based wellness program, however, the County Administrator needed to amend the County's wellness programs and Plan premiums as follows:

---

[6] The second page of the August 16 Memo, beneath the County Administrator's signature block, appears to indicate that the memorandum was written on August 12, but was not disseminated to the Board until August 16, which is the date at the top of the first page of the document itself. Exhibit A.

12

> Instead, I propose we shift costs within our current wellness incentive program. As a group health plan wellness program, we are permitted to tie incentives to tobacco use status that can amount to 50% of the total cost of coverage applied to the lowest cost plan ($201.71). The 50% ($100.86) includes the wellness incentive program which cannot exceed 30% ($60.51) of the lowest cost plan. By including the tobacco use status in the 50% category instead of the 30% category, this results in an allowable $45.51 per pay period cost that can be assessed as a vaccine surcharge. Because there are no current federal rules concerning a vaccine surcharge, that cost must be included in the 30% attributed to the wellness incentive program.
>
> <u>I propose to keep the health insurance premium discounts in place and that we assess a $45.51 per pay period ($1,183.26 annually) vaccine surcharge for all unvaccinated employees who are on our insurance plan effective November, 2021</u>. (Emphasis in original.)

79. The September 20 Memo was presented to the Board for action at its September 21, 2021, meeting.

80. At the September 21, 2021, Board meeting, by a vote of 4-1, the Board adopted the County Administrator's proposed change in the disincentive package from his September 20 Memo. Put another way, the Board voted to place a surcharge of $45.51 per pay period on unvaccinated employees who receive County medical insurance (Vaccine Surcharge).[7] Exhibit D.

81. The County Administrator also regularly issued memoranda to the Board which summarized tracking data, by County department, of employee vaccination rates.

82. On September 30, 2021, County Supervisor, District 2, Dr. Matt Heinz, sent a letter to the Clerk of the Board, Julie Castañeda, asking that a "Vaccine Mandate for All Pima County Employees" item be added to the Board's October 5, 2021, meeting agenda. The Clerk added that item to the agenda.

83. Supervisor Heinz's September 30, 2021, letter, also specifically noted that "The Sheriff's Department was listed as having achieved only a 48.4% vaccination rate as of 9/27, which is unacceptable."

---

[7] The Vaccine Surcharge does not apply to unvaccinated employees who have a County-approved religious or medical exemption.

13

84. On October 5, 2021, the Board continued the vaccine mandate agenda item for two weeks, directing the County Administrator and staff to propose a "workable" COVID-19 mandate.

85. In an October 6, 2021, memorandum from the County Administrator to Chief Deputy County Administrator Lesher, Deputy County Administrator & Chief Medical Officer Francisco García, M.D., M.P.H., and others, the County Administrator listed "Adjusting self-insurance medical rates in accordance with medical claims expenses for unvaccinated employees" as one of six "options" which "the County can take regarding taking actions that would include an unvaccinated employee to become vaccinated." Exhibit E.

86. At the October 19, 2021, Board meeting, the Board approved three recommendations "developed to encourage COVID-19 vaccinations of employees." Exhibit F.

87. The Board also extended the mandatory vaccination compliance deadline to January 1, 2022.

88. On October 22, 2021, at the request of Supervisor Christy, the County Administrator issued a memorandum outlining costs incurred by the Plan, including total claims for Fiscal Year 2020/21, and additional costs incurred due to COVID-19. The County Administrator also noted that the number of employees who will be "paying the surcharge of $45.01 and per pay period" was unknown. Exhibit G.

89. The County's vaccine surcharge became effective November 1, 2021.

90. Plaintiff Barkman is not vaccinated against COVID-19.

91. Plaintiff Murphy is not vaccinated against COVID-19.

92. Effective November 1, 2021, Plaintiff Barkman's health insurance premium (denoted on the County's Earnings Statement as "HDHP w EE") increased by $45.51, from $42.38 per pay period to $87.89 per pay period. Exhibit H.

93. Effective November 1, 2021, Plaintiff Murphy's health insurance premium (HDHP w EE) increased by $45.51, from $75.40 per pay period to $120.91 per pay period. Exhibit I.

**COUNT ONE**
**Violation of the Affordable Care Act**

94. The vaccine surcharge establishes that the County's wellness program is a health-contingent, outcome-based program. Employees only avoid the surcharge when they are vaccinated against COVID-19 (or if they receive a religious or medical accommodation.)

95. All health-contingent, outcome-based wellness programs must make any reward available to all similarly situated individuals, which means that employers must provide a reasonable alternative standard or waive the standard upon an employee's request.

96. Health-contingent, outcome-based wellness programs also require the employer to disclose the availability of the possibility of the reasonable alternative standard or waiver in all materials describing the terms of the wellness program.

97. As noted by the County Administrator, the County's wellness program imposes surcharges on tobacco users. However, tobacco users are entitled to the opportunity to avoid the surcharge by engaging in a reasonable alternative standard (such as education or smoking cessation programs) even if they never stop using tobacco.

98. The County, however, has never identified or offered a reasonable alternative standard to being vaccinated, even if the employee is never vaccinated.

99. Employers must also give the employee the opportunity to qualify for the wellness program reward at least once per year.

100. Save for vaccination status, however, the County has never articulated how long the Vaccine Surcharge will remain in effect, especially now that booster shots have received federal government approval because public health experts are starting to see reduced protection for those fully vaccinated, especially among certain populations, against mild and moderate disease.

101. The County's vaccine surcharge is also coercive in violation of federal law.

//

//

**PRAYER FOR RELIEF**

Plaintiffs request that the Court:

A.   Issue a Declaratory Judgment that the County's vaccine surcharge violates the Affordable Care Act and is therefore unlawful;

B.   Vacate the County's vaccine surcharge and declare that any actions taken pursuant to it are null and void;

C.   Issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, enjoining the County from imposing its Vaccine Surcharge on unvaccinated employees until this matter is resolved;

D.   Award Plaintiffs, and those similarly situated, damages, including reimbursement in the form of restitution of any already-paid Vaccine Surcharges, and other compensatory damages;

E.   Award Plaintiffs reasonable attorneys' fees and costs;

F.   Grant any other equitable and legal relief that the Court deems just, proper, and appropriate;

**JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

Respectfully submitted this 9th day of December, 2021.

JACOBSON LAW FIRM

*s/ Jeffrey H. Jacobson*
JEFFREY H. JACOBSON

*s/ Alexis B. Sharpe*
ALEXIS B. SHARPE
*Attorneys for Plaintiff*

Filed via the CM/ECF system this 9th day of December, 2021