**JACOBSON LAW FIRM**
570 N. COLUMBUS BLVD., SUITE B
TUCSON, AZ 85711
TELEPHONE (520) 834-8034
FACSIMILE (520) 844-1011
jeff@jacobsonlawfirm.net
Jeffrey H. Jacobson, SB No. 019502
Alexis B. Sharpe, SB No. 034177
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Conference of Police and Sheriffs, Inc., an Arizona non-profit corporation; Dawn Barkman; and Joseph Murphy on their own behalf and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>Pima County,<br><br>Defendant. | Case No.:<br><br>**PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION** |

Plaintiffs, through undersigned counsel, respectfully moves that this Court issue a preliminary injunction staying the vaccine surcharge of $45.51 per pay period on health insurance premiums for unvaccinated employees. In doing so, Pima County violated its obligations under the Health Insurance Portability and Accountability Act (HIPAA) of 1996 which addresses penalties and incentives in employee wellness programs. Since this vaccine surcharge became effective on November 1, 2021, Plaintiffs (and those similarly situated) pay a $45.41 surcharge every pay period. As it stands, the Plaintiffs (and those similarly situated) will face a choice—either continue to pay every pay period or become vaccinated, despite personal or medical concerns, because they simply cannot afford to wait until this Court deems the surcharge unlawful.

Unless the Court temporarily enjoins Pima County's health insurance premium surcharge, Plaintiffs (and those similarly situated) will continue paying higher insurance

premiums when consumers are already facing rising inflation. These financial harms will continue to accrue without a remedy until this litigation is resolved. Every pay period, the Plaintiffs (and those similarly situated) will lose $45.51 as a result of this unlawful surcharge. This is a substantial amount for those living paycheck-to-paycheck. To be clear: Plaintiffs take no position on vaccines or vaccine mandates. Plaintiffs merely ask the Court to require Pima County to follow federal law. As one District Court in Georgia recently noted:

> "[t]his case is not about whether vaccines are effective. They are." *Kentucky v. Biden*, No. 3:21-cv-55, 2021 WL 5587446, at *9 (E.D. Ky. Nov. 30, 2021). Moreover, the Court acknowledges the tragic toll that the COVID-19 pandemic has wrought throughout the nation and the globe. However, even in times of crisis this Court must preserve the rule of law and ensure that all branches of government act within the bounds of their constitutionally granted authorities. Indeed, the United States Supreme Court has recognized that, while the public indisputably "has a strong interest in combating the spread of [COVID-19]," that interest does not permit the government to "act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) (*citing Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,582, 585-86 (1952)).

*Georgia v. Biden*, No. 1:21-cv-00163-RSB-BKE, 2021 U.S. Dist. LEXIS 234032 at *2 (S.D. Ga. Dec. 7, 2021).

Facing the risk of additional lost income, many Pima County employees may opt to receive the vaccine, despite their personal beliefs or health concerns, simply because they cannot otherwise afford to pay higher health insurance. And for those that are unable or unwilling to become vaccinated because of personal beliefs or health concerns, those employees may also suffer other significant harms that monetary damages cannot remedy including, but not limited to, inability to pay other obligations (such as a mortgage or car insurance), the inability to pay for life-saving medical care, and the disruption of support for dependents who need it. For these Plaintiffs (and those similarly situated) time is of the essence— they cannot afford to wait, and continue to pay, while litigation is pending.

This Court should exercise its equitable jurisdiction to temporarily enjoin Pima County's surcharge on health insurance premiums for unvaccinated employees "to

2

preserve the court's ability to later order meaningful relief." Fed. R. Civ. P. 65; *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir.1984); *Gon v. First State Ins. Co.*, 871 F.2d 863 (9th Cir.1989).

## I.  STANDARD OF REVIEW

To obtain a temporary restraining order or preliminary injunction, Plaintiffs must establish: 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in their favor; and 4) that an injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (internal quotation marks omitted). When the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Courts also apply an alternative "sliding scale" or "serious questions" approach where "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "To reach this sliding scale analysis, however, a moving party must, at an 'irreducible minimum,' demonstrate some chance of success on the merits." *Global Horizons, Inc. v. United States DOL*, 510 F.3d 1054, 1058 (9th Cir. 2007) (*citing Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987)). As discussed below, under either analytical framework, Plaintiffs are entitled to a preliminary injunction in this case.

## II.  ARGUMENT

### A.  Plaintiffs are Likely to Succeed on the Merits

Likelihood of success on the merits is "the most important" factor. As discussed below, Plaintiffs are likely to succeed on the merits because Pima County is violating federal law.

The Patient Protection and Affordable Care Act (ACA) was adopted by Congress and signed into law in 2010. Among other effects, the ACA amended the Health Insurance Portability and Accountability Act (HIPAA) of 1996. Wellness programs are regulated in part by HIPAA, as amended by the ACA, as well as by HIPAA's implementing regulations. The ACA also codified prior agency guidance on wellness programs and expanded the scope of permissible incentives under such programs.

Generally, federal law prohibits group health plans from charging similarly situated individuals different premiums or contributions or imposing different deductibles, copayment or other cost sharing requirements based on a "health status-related factor." However, entities providing health insurance may offer "premium discounts or rebates" on a plan participant's copayments or deductibles in return for that individual's compliance with a wellness program as follows:

> A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

29 U.S.C. § 1182(b)(1); *see also* 26 U.S.C. § 9802(b)(1); 42 U.S.C. § 300gg–4(b)(1).

A "health status-related factor," also referred to as a health factor (Health Factor), is defined as:

| | |
|---|---|
| A. | Health Status |
| B. | Medical condition (including both physical and mental illnesses). |
| C. | Claims experience. |
| D. | Receipt of health care. |
| E. | Medical history. |
| F. | Genetic information. |
| G. | Evidence of insurability (including conditions arising out of acts of domestic violence). |
| H. | Disability |

29 U.S.C. § 1182(a)(1).

4

Vaccinations are a Health Factor because the individual being vaccinated receives health care (the vaccine) which inherently and irrevocably results in a health-related standard (being vaccinated.). Federal law also allows employers offering a group health insurance coverage to establish premium discounts or rebates, or to modify otherwise applicable copayments or deductibles, in return for adherence to programs of health promotion and disease prevention. 29 U.S.C. § 1182(b)(2)(B); *see also* 26 U.S.C. § 9802(b)(2)(B); 42 U.S.C. § 300gg–4(b)(2)(B). Such a reward or incentive may include a discount on insurance costs or a penalty that increases the plan participant's costs because of non-participation in the wellness program. See 26 C.F.R. § 54.9802-1(f)(1)(i).

Wellness programs are either "health-contingent" or "participatory." 29 C.F.R. § 2590.702(f). Federal law allows health plans and insurers to offer incentives of up to 30% of the cost of coverage in exchange for an employee's participation in a health-contingent wellness program. A health-contingent wellness program is where the reward is based on an insured individual's satisfaction of a particular health-related factor. If none of the conditions for obtaining a reward under a wellness program is based on a person satisfying a health-related standard (or if a wellness program does not provide a reward), the program is considered "participatory." 29 C.F.R. § 2590.702(f)(1)(ii). On the other hand, a wellness program that requires individuals "to satisfy a standard related to a health factor to obtain a reward (or… undertake more than a similarly situated individual based on a health factor in order to obtain the same reward)" is a "health-contingent" program. 29 C.F.R. § 2590.702(f)(1)(iii). Health-contingent programs have five requirements.:

a) The employee must be given the opportunity to qualify for the reward at least once per year;
b) The 'reward' cannot generally exceed 30% of the cost of the employee coverage under the plan;
c) The program must be reasonably designed to promote health or prevent disease;
d) The reward must be available to all similarly situated individuals, which means employers must provide a reasonable alternative standard or waive the standard upon an employee's request; and

5

e) The employer must disclose the availability of the possibility of the reasonable alternative standard or waiver in all materials describing the terms of the wellness program.

29 C.F.R. § 2590.702(f)(3)–(4)

Health-contingent programs can be either activity-only or outcome-based. 29 C.F.R. § 2590.702(f)(1)(iii). Activity-only programs simply require that individuals engage in a health-related activity, such as an exercise program. 29 C.F.R. § 2590.702(f)(1)(iv)–(v). An activity-only wellness program requires an individual to perform or complete an activity related to a health factor in order to obtain a reward but does not require the individual to attain or maintain a specific health outcome. 29 C.F.R. § 2590.702(f)(1)(iv). In activity-only wellness programs, the reasonable alternative standard must be available to individuals who have a medical condition that makes it unreasonably difficult to satisfy the applicable standard. *Id* at § 54.9802-1(f)(3)(iv).

Outcome-based, health-contingent programs require that individuals maintain a certain health standard, such as receiving certain test results or being tobacco free. 29 C.F.R. § 2590.702(f)(1)(iv)–(v). Importantly, for outcome-based wellness programs, the reasonable alternative standard must be available to any individual who does not meet the initial standard based on the measurement, test, or screening. *Id* § 54.9802-1(f)(4)(iv).

Finally, the Equal Employment Opportunity Commission (EEOC) has determined that employers are permitted to offer employee incentives for voluntarily receiving a vaccination. *See* https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K.15 An incentive includes both rewards and penalties. However, the incentive cannot be "so substantial as to be coercive." *Id.*

On August 16, 2021, Pima County Administrator Charles "Chuck" Huckleberry issued a memorandum to the Board of Supervisors entitled "COVID-19 Vaccination Incentives and Disincentives." That memorandum listed, as one of three disincentives:

Developing a separate health insurance medical premium for unvaccinated employees due to medical expense risk related to contracting COVID-19. An additional $25.51 remaining surcharge can be applied to all tier levels (employee only, employee plus spouse, employee plus children, and employee plus family) or $663.26 annually.

6

The same memorandum also acknowledged that disincentives two and three:

> are regulated by the . . . ACA which permits employers to offer up to 30 percent of the cost of health plan coverage as an incentive to participate in a wellness program (or surcharge.) An employer may offer up to 30 percent of the total cost of self-only health plan coverage to an employee as an incentive (surcharge) to participate in a wellness program. If the employer offers more than one plan, the 30 percent applies to the lowest cost plan. Here, the total amount that can be applied to a surcharge for any employee is $60.51 per pay period ($35.00 + $25.51) or $1,573.26 annually.

Finally, the August 16 Memo recommended the Board "adopt incentives for vaccinated employees and disincentives for unvaccinated employees" to consist of:

> a) a one-time $300 COVID-19 Health Incentive for all employees fully vaccinated by October 1, 2021; and

> b) A financial disincentive for unvaccinated employees effective October 1, 2021 that eliminates all health insurance premium discounts ($35 per pay period) and add a 30 percent base plan surcharge of $25.51 per pay period for a total disincentive amount of $60.51 per pay period or $1,573.26 per year. Unvaccinated employees with a valid medical or religious exemption would not be subject to the surcharge.

At its meeting on September 7, 2021, the Board of Supervisors continued its discussion of the "vaccine disincentives" agenda item. During debate, "Supervisor [Steve] Christy reiterated his concern regarding liability issues that could arise from imposing disincentives on employees. He stated that the County and the County Administration were instituting a hostile work environment by financially penalizing unvaccinated employees. He added that lawsuits could be more-costly than the alleged increases to the health care program." On September 7, 2021, by a 4-1 vote, the Board approved the vaccine disincentives presented by the County Administrator.

On September 20, 2021, the County Administrator issued a memorandum "Amending the Proposed Vaccine Disincentive in Order to Preserve the Health Insurance Premium Discount (Wellness) Program." The first paragraph of that memorandum indicates, in part:

> After additional consideration, I am recommending that we maintain the health insurance premium discounts for unvaccinated employees. These

discounts were earned by the employee in recognition of the employee's adherence to several key elements of a healthy lifestyle. If, for example, an employee is and remains tobacco free he or she earns $20 per pay period. While we must encourage employees to become vaccinated, to penalize a nonsmoker for not being vaccinated could inadvertently negate the importance of not smoking. The same principle is true for the variety of health lifestyle incentives.

**** **** **** ****

I am recommending . . . that we amend the disincentives to include only a separate health insurance medical premium for unvaccinated employees due to the increased medical expense risk related to contracting COVID-19. As a result, the full amount of the financial disincentive previously approved of $60.51 per pay period or $1,573.26 per year cannot be assessed if we are to remain compliant with the [ACA] as defined by the [EEOC].

To accomplish the goal of creating the disincentive, and remain a legally-compliant health-contingent, outcome-based wellness program, the County Administrator needed to amend the County's wellness programs and Plan premiums as follows:

Instead, I propose we shift costs within our current wellness incentive program. As a group health plan wellness program, we are permitted to tie incentives to tobacco use status that can amount to 50% of the total cost of coverage applied to the lowest cost plan ($201.71). The 50% ($100.86) includes the wellness incentive program which cannot exceed 30% ($60.51) of the lowest cost plan. By including the tobacco use status in the 50% category instead of the 30% category, this results in an allowable $45.51 per pay period cost that can be assessed as a vaccine surcharge. Because there are no current federal rules concerning a vaccine surcharge, that cost must be included in the 30% attributed to the wellness incentive program.

I propose to keep the health insurance premium discounts in place and that we assess a $45.51 per pay period ($1,183.26 annually) vaccine surcharge for all unvaccinated employees who are on our insurance plan effective November, 2021. (Emphasis in original.)

At the Board of Supervisors' September 21, 2021, meeting, it adopted the proposed change in the disincentive package from his September 20 Memo. Put another way, the Board voted to place a surcharge of $45.51 per pay period on unvaccinated employees who

receive County medical insurance. The vaccine surcharge does not apply to unvaccinated employees who have a County-approved religious or medical exemption.

On October 22, 2021, at the request of Supervisor Christy, the County Administrator issued a memorandum outlining costs incurred by the Plan, including total claims for Fiscal Year 2020/21, and additional costs incurred due to COVID-19. The County Administrator also noted that the number of employees who will be "paying the surcharge of $45.01 and per pay period" was unknown. The County's vaccine surcharge became effective November 1, 2021.

The vaccine surcharge establishes that Pima County's wellness program is a health-contingent, outcome-based program. Employees only avoid the surcharge when they are vaccinated against COVID-19 (or if they receive a religious or medical accommodation.) In other words, its wellness requires employees to satisfy a standard related to a health factor (being vaccinated) to avoid the disincentive (the surcharge.) All health-contingent, outcome-based wellness programs must make any reward available to all similarly situated individuals, which means that employers must provide a reasonable alternative standard or waive the standard upon an employee's request.

Pima County's health-contingent, outcome-based wellness program violates federal law because it has failed to make a reasonable alternative standard available to unvaccinated employees. For example, Pima County's wellness program imposes a health insurance surcharge on tobacco users. However, tobacco users are entitled to the opportunity to avoid the surcharge by engaging in a reasonable alternative standard - such as education or smoking cessation programs - *even if they never stop using tobacco*. Pima County, however, does not offer a reasonable alternative standard to being vaccinated, even if the employee is never vaccinated. Federal law also requires employers to give its employees the opportunity to qualify for the wellness program reward annually. Pima Count has never, however, articulated how long its vaccine surcharge will remain in effect. Finally, Pima County's vaccine surcharge is also clearly designed to be coercive. As discussed above, this also violates the EEOC's guidance on wellness program incentives

and disincentives. For these reasons, Plaintiffs are likely to succeed on the merits of their claims.

**B.    Plaintiffs' Irreparable Injury**

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (emphasis omitted). The analysis focuses on irreparability, "irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999). The threat to the economic interests of those whom the surcharge is imposed is not some amorphous concept. Given that the surcharge was imposed beginning November 1, 2021, this is a live issue for many Pima County employees, not based on speculative harm. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury") (internal citation omitted).

Preliminary injunctive relief is also imperative. Without such relief, Plaintiffs (and those similarly situated) face an impossible choice - one for which this Court will have no remedy. While irreparable harm may be difficult to define, it is often marked by an inability to be adequately remedied by money damages. *See Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) (citation omitted). Here, Pima County employees must decide whether to receive the COVID-19 vaccine or continue paying higher insurance premiums without a reasonable alternative standard as required by law. It is understandable that Pima County employees may be considering acquiescing to Pima County's coercion – thereby risking their conscience and personal beliefs - in favor of financial stability. Pima County employees should not be forced into forsaking their sincere beliefs simply because Pima County has not followed federal law. The damage, absent an injunction will be not only significant, but permanent for those who choose to get vaccinated solely because they cannot afford the surcharge. In other words, for those who become vaccinated only because they cannot afford the alternative, there is no available retroactive remedy. As such, the detrimental consequences of not issuing the injunction cannot be overstated because the harm is irreparable.

10

### C.    Balancing the Equities Clearly Favors Plaintiffs

As the Pima County government is a party, courts consider the balance of equities and the public interest together. *Jewell*, 747 F.3d at 1092. It is well-established that balancing the equities is not an exact science. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609, 72 S. Ct. 863, 96 L. Ed. 1153, 62 Ohio Law Abs. 417 (1952) (Frankfurter, J., concurring) ("Balancing the equities . . . is lawyers' jargon for choosing between conflicting public interests"). Here, however, there is no such conundrum.

Plaintiffs have demonstrated the irreparable injury is imminent absent an injunction. Defendant's interest lies in implementing measures which protect the health and wellness of both the general community and Pima County employees. But it must do so in congruence with the law. Pima County is clearly allowed to use its wellness programs for disincentive programs *as long as* it concurrently implements a reasonable alternative standard to the required health factor. Defendant's obligation to implement a reasonable alternative standard to being vaccinated (in order to avoid the health insurance surcharge) is hardly onerous. For example, Pima County could reasonably mandate that unvaccinated employees take regular COVID-19 tests and wear a mask. This would be consistent with the Occupational Safety and Health Administration's recent Emergency Temporary Standard (ETS).[1] In fact, Pima County already provides this alternative standard to those who are unvaccinated and have received a religious or medical accommodation. Therefore, because the burden of the harm to Defendant is less severe than the likely harm to Plaintiffs, the equities unequivocally favor Plaintiffs.

### III.    CONCLUSION

Plaintiffs have demonstrated that a preliminary injunction is warranted. "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee*

---

[1] *See* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021) (to be codified at 29 C.F.R. pts. 1910, 1915, 1917, 1918, 1926, and 1928)

*Assistance Project*, 137 S. Ct. 2080, 2087, 198 L. Ed. 2d 643 (2017). Plaintiffs Barkman and Murphy and those similarly situated, including other members of AZCOPS and other unvaccinated Pima County employees, will be irreparably harmed if Defendant's unlawful rule is allowed to stand because of the financial burden of paying more for health insurance without a reasonable alternative standard. In addition, Plaintiffs are likely to succeed on the merits of the claims. Finally, staying the vaccine surcharge will preserve the pre-disincentive status quo, which is in the public interest and does not harm the government's interest, and for the same reason, the balance of equities weighs in Plaintiffs' favor. For these reasons, the Court should issue a preliminary injunction staying Pima County's vaccine surcharge on health insurance premiums for unvaccinated employees who have not sought and who do not qualify for a religious accommodation or medical exemption.

Respectfully submitted this 9th day of December, 2021.

**JACOBSON LAW FIRM**

*s/ Jeffrey H. Jacobson*
JEFFREY H. JACOBSON

*s/ Alexis B. Sharpe*
ALEXIS B. SHARPE
*Attorneys for Plaintiff*

Filed via the CM/ECF system this 9th day of December, 2021